The final case on the calendar, Almighty Supreme Born Allah. May it please the court, my name is Assistant Attorney General Stephen Barry and I'm representing the appellants in this matter. In this case, the district court found on page 29 of its decision, the appendix and the special appendix, that the evidence shows that the defendants, though mistaken, were simply trying to fulfill their professional duties. The district court's decision denying qualified immunity runs afoul of the recent Supreme Court decision, White v. Pauli, in which the Supreme Court reiterated that qualified immunity protects all but the plainly incompetent and those who knowingly violate the law. It runs afoul of that case further in that White reiterates that qualified immunity attaches when officials' conduct does not violate clearly established rights. You think it wasn't established that pretrial detainees are not subject to punishment? That is certainly the standard that the court used and White goes further to state that . . . I'm asking you. You think it wasn't clearly established? That proposition was clearly established, certainly was. What was not clearly established was the more narrow proposition. White v. Pauli talks about qualified immunity cannot be defined at such a high level of generality. You have to look at what . . . Let's go back. First, no argument that he was a pretrial detainee. Correct. Is there any argument that administrative segregation, the way it was imposed, was punishment? Yes, there is. What is the argument? Five pieces of mail, what did that have to do with prison security? To answer that in two ways, one, the five pieces of mail that was talked about. The court found that the conditions in A.S. were punishment. Tell me where the court was wrong. Based on comparing the conditions or the restrictive nature, the restrictive directive in administrative segregation versus punitive segregation. That's the only basis for the district court's conclusion that this was punishment. Now, in phase one, right, he didn't receive any counseling, isn't that correct? The court's finding was that there was no counseling at all in phase one. What we have here . . . Isn't that a problem in the sense that it seems like this is a punishment and that nothing is . . . there is nothing in phase one that suggests that what you're trying to do is to prepare him for reentry into the general population. The district court and Second Circuit has looked at this very A.S. program a number of times and determined that that is an appropriate . . . that it's not punishment. What . . . So . . . How can his isolation in phase one be justified as reasonably related to protecting institutional security by preventing riots or any other peniological interests when, for example, he receives no counseling during this period in phase one? And to answer that question, the testimony at trial was clear that when an inmate is assigned to administrative segregation, they first are removed from the general population, assessed. There are restrictions that ultimately get brought back. You're thinking . . . Mr. Griggs talked about a carrot and a stick process of teaching an inmate the ways to do his time successfully in . . . It's a little hard for me to distinguish the . . . in the case of a sentence prisoner, even the difference between the punitive and the administrative to the extent that this is triggered by apparent misconduct or something that . . . conduct that concerns the institution. And then as a result of that conduct, he is subjected to a sanction to teach him a lesson, essentially. And the lesson is if you do this kind of thing again, you're going to be put in segregation. And then if you behave better in segregation, you'll advance back to . . . That looks like a kind of punishment. What am I missing about that? And Connecticut's system is different than some . . . even in New York. New York has a . . . administrative segregation is considered a form of punishment. So I think that the system in Connecticut, punitive segregation is for a very limited time. You are sentenced to punitive segregation. Privileges are . . . and things we're looking at are completely . . . you don't get those at all. Isn't that step one of the administrative segregation? Isn't that punitive segregation? There are similarities between those two steps. But the overall process in place, which has been upheld . . . I don't care what you call it. We're looking at the effect on the prisoner. Didn't he have to wear leg irons whenever he left the cell? He did and as . . . How could that not be punitive? What . . . there was a justification for that. And that, Captain Cahill talked about the . . . Let me try this from another . . . What's the justification for limitations on showers? The . . . Captain Cahill talked expressly about the level of security needed at Northern. In particular, the inmates that were at Northern, the problems that had been at Northern. Even the plaintiff testified as to that. Limited access to showers, limited access to religious services, limited access to family members. All that taken together suggests punishment. And the case law up until that point certainly had not established that those very conditions . . . Let me approach this from a different angle. Can I just finish my thought? If there are other things going on, for example, counseling or something that suggested that it was not punishment, that would be one thing. But, it seems that everything, at least in this Phase I, goes to something that's quite punitive. And Captain Cahill did testify that it was . . . there was some programming in Phase I. But, the court obviously found otherwise. You don't have any doubt, do you, that if every detainee in Connecticut were routinely sent to an institution that imposed these requirements on everybody . . . and a lawsuit along the lines of Bell v. Woolfish were brought, it would be held that those conditions could only be considered punitive. Under that . . . Under that scenario.  The justification . . . So, what you're really saying, and I take it, you would at least think, and I might agree, that if those kinds of conditions were imposed on an individual . . . who had a record of trying to escape from custody, who had, in a previous term of incarceration, stabbed a guard . . . who was, there was evidence, was a gang leader who communicated with people inside and outside the prison, in ways that could disrupt prison security . . . that some set of conditions like this could be imposed, even in pretrial detention. They could be, but it really depends factually on, certainly, when did all those events occur. But, so what we're really talking about here is whether these conditions are excessive or are appropriately imposed on a record regarding this individual . . . based on his prior conduct and his prior classification in the Connecticut penal system. Correct. So, that's what we're really . . . That sums up, and certainly in this case . . . I'm sorry, Your Honor. And, your argument, I take it, is that that's a question of degree. And, even if the District Court was correct that this really was excessive, that still would entitle qualified immunity . . . because nobody had ever figured out exactly how much you have to look like, for example, Mr. Cabral in our previous case . . . or where along the spectrum you fall, before this degree of restraint can be imposed on a prisoner . . . a detainee, based on an assessment of their security risk. Is it fair to say that's your argument? That's a fair summary of the argument. And, in this particular case, what we have . . . if you strip away . . . Well, I mean, that's . . . Okay. So, up to now, I've been trying to help you. Now, I'm going to turn around, because . . . Fair enough. The issue, I think, is . . . First, before we get to the qualified immunity, is there even a violation here . . . turns on an assessment of how much deference gets given to the prison authorities . . . and how much of an individualized consideration does there have to be. Because, here, the District Court's findings, as I take it, was that the only consideration . . . was that he was, for reasons that may seem not that dramatic . . . he happened to be in a certain security level, once before, when he was incarcerated. Right? But, that's the only factor that dictated this. That's the District Court's finding. That is the District Court's finding, and it goes to the analysis of what was excessive. These individuals were asked to . . . and the evidence of why these individuals made the decision to place Mr. Alaa on AES . . . was the underlying incident report, the underlying administrative segregation package . . . And, those were only admitted for the purposes of what they actually relied on. There was no testimony that this wasn't a major event from Mr. Alaa. Well, I mean, boy, I mean, he asked to speak to a lieutenant. Now, you know, he didn't suggest himself that it was inappropriate on this record . . . to have that sanction, or whatever you call it, imposed back at the time it was imposed. But, by the same token, if what we're asking is . . . should a . . . on what showing has to be made . . . before a pretrial detainee is subjected to such extreme measures . . . is asking for a lieutenant to come and address a grievance . . . the sort of thing that, you know, is comparable to the kind of conditions that have been upheld for . . . you know, terrorist sheiks and leaders of the Latin Kings and whatever . . . when they are pretrial detainees in cases where they're charged with multiple murders . . . and terrorist plots and things of that kind. And, that's what the District Court did in this case. Again, defendants claim erroneously . . . was determine the most innocent explanation of that event. What these individuals had before them . . . was an incident report describing not only that Mr. Alai asked to speak to a lieutenant . . . because he was unhappy about the day of commissary. But, he also incited 50 other inmates to also engage in this protest . . . or try to get other folks involved in this. He was identified as the ringleader of this group. This happened within a year of when he is readmitted. Again, the District Court's decision, certainly in my view, would be that . . . the correctional officials would almost have to put on blinders . . . and not acknowledge what they had in front of them, as to what happened. And, not necessarily accept the most innocent explanation of all. That's something that the Supreme Court has advised that courts shouldn't do. These folks had to make a tough decision. And, imagine the Hobson's choice they have. They allow Mr. Alai to go into general population . . . and he does the very same thing he had only done a year before. There'd be all, you know, lawsuits again, about failure to protect. How could you send this person back, when within a year, he had done what he had done? You had all this information in front of you, that he had done that. This is a classic case of second-guessing the prison officials. Again, if it . . . Again . . . I'm sorry. Finish your thought. No. If this was something that, you know, if it had happened . . . Significantly, you know, 10 years, you know, 5 years before he was coming back. If he had gone through, further into the programming, which is designed . . . The phase program is designed, one, to teach inmates . . . Again, how to deal with the time. How to not ask and gather folks with you, to try to protest the fact that you're not getting commissary. All of those lessons learned, that we all can do on the street, are things you can't do in a correctional facility. And that's . . . He had not been through that process, yet. And again, it was a very short time frame, and he's back in again. So, all of that information that these individuals are faced with . . . Again, they're trying . . . It's a difficult decision. They're making decisions for safety of staff, other inmates, and that inmate himself. What do we . . . What would we do, in your view, if . . . Let's say phase 1, we found problematic. But, phases 2 and 3, we said we're fine. I think, given that, still qualified immunity would protect the defendants we have here. And frankly, the defendants we have here are the officials that placed him in administrative segregation. They're classification officials with a different hierarchy.  But, his involvement here, what Captain Cahill did, was he recognized that the plaintiff had already been in phase 1 for a time, and offered up a credit for that time, so that he could progress to phase 2 in a quicker fashion. Now, the plaintiff rejected that offer for reasons that he felt he shouldn't have been there in the first place. But, Captain Cahill was certainly not evidencing any intent to punish. And, he's not at the level, frankly, to do that. Thank you. You'll have time in rebuttal. Thank you. I was going to say good morning, but good afternoon. If it may please the Court, my name is John Morgan. I have the privilege to have been appointed by the Court to represent Almighty Supreme Bornala in this matter. We respectfully submit that the District Court correctly found that the Connecticut Department of Corrections unconstitutionally punished Mr. Alla while a pretrial detainee pursuant to Wolfish v. Vell, Benjamin v. Frazier, and Iqbal v. Hastie, among others. Let me try and narrow in on what you are and aren't arguing. Sure. You're not contending, are you, that no pretrial detainee, no matter what his history and record, could be properly subjected to these conditions? Of course not. I mean, the Ramsey case cited by the party opposite clearly exemplifies the circumstance where it's appropriate. Here's a guy who assaulted officers. Here's a guy who tried to escape while a pretrial detainee. There was another case cited in one of the briefs, a Puerto Rico case, where the individual was actually committing crimes while in pretrial lockup, but sure. Mr. Alla, you argue, and I find it hard to quarrel with this, is entitled to an individualized determination as to what level of security is required in his particular case. We said that and so did the District Court, yes. Right. And he had, in some sense, an individualized determination. In other words, 90%, I assume, of the people who are detainees or more don't get subjected to this treatment. He was kind of singled out. So it really boils down to what are the appropriate factors that should be taken into account in deciding how much individual treatment does he get? In other words, you're saying it's not really individual because it's based on a kind of hard and fast rule, and also that even taking into account what was taken into account, this was just excessive. Yes and yes. More correctly, or more specifically, the things that were, quote, taken into account. I mean, the state is trying to recast this whole thing about it as a riot and 50 people. First of all, that's not true. But second of all, that's not what they did. They looked at one and only one thing. Was he in administrative segregation? Then he's going back in. That's it. That's the District Court's finding. That is the District Court's finding. And that looks punitive, among other reasons, because it has sort of the smell of you owe us time. Yes. Okay. But beyond that, the actual conditions of incarceration in the administrative segregation program as applied to a pre-child detainee, number one, doesn't make any sense even for an incarcerated prisoner post-conviction, but for a pre-child detainee, it's even more onerous. We're talking about things like showering with clothes on. We're also talking about restrictions on mail. The thing that we found most kind of compelling is if you're in administrative segregation, you're not eligible for statutory good time or meritorious service. You are if you're in punitive segregation, though. So that doesn't make any sense. Is it your view that if he shouldn't have been in administrative segregation in the first place, that therefore we don't have to look at what happened in Phase 2 and Phase 3? So, in other words, if Phase 2 and Phase 3, if he were treated qualitatively differently than he had been treated in Phase 1, where in, let's say, Phase 2 and Phase 3, there's counseling, there's taking meals with other inmates, there's restoration or relaxation of restrictions in Phase 2 and Phase 3. Do we even look at those phases? Well, I misunderstood your question, but let me kind of break it down if I can. There's several things. Should he have been in administrative segregation in the first place, meaning in his prior incarceration? I don't know that it matters. For purposes of, because I think that situation, he's incarcerated, and there are cases that say, whether he's in administrative, say he didn't get a vote. So that's separate and apart. As a pretrial detainee, if they had had some individualized suspicion that this guy was a problem, there is a number of restrictive statuses that could have been applied to him, ranging from 23 hours a day in lockdown and solitary confinement to a traditional prison situation where you're in cell, segregated, but you have some independent, to the open floor plan situation that he had the first time around, which is what presumably proved problematic. There's also other kinds of restrictive statuses that are applied to, for instance, gang members, all of which is in the chart, by the way, or to sex offenders or to others who might present a security risk. But they went, basically they went from 0 to 60, and they're at 120. They went right to administrative segregation because that's what their manual provided. That's right. So he didn't get an individualized examination of the likelihood that he would be problematic. That's right. They just put him in administrative segregation because he was there before. That's right. Okay, so Mr. Morgan, let me assume for the purposes of this question that I absolutely agree with everything you said, that this is a constitutional violation. Mr. Barry started, he contests that, of course, but he started by saying, but really the issue here is qualified immunity. So what I'm wondering is here you have prison officials who did follow a manual, who made a choice about where to put this person, and let's say we absolutely agree it was the wrong choice and even an unconstitutional choice. What authority can be relied on to say, what do you rely on to say anyone should have known this, that this was unconstitutional behavior? There's no case saying you can't follow that manual. There's not even many cases saying, although some of this might be obvious, that you couldn't do this to everybody. Where do we go to say these officers should absolutely have known that this was a wrong decision to place him in administrative segregation? Taking your last point first, I think it would be less constitutionally suspect if they did this to everybody. They said, look, we've reached the conclusion that the best way to maintain, we've done some study that shows that people are better off having 23 hours alone. Maybe if they had a study, but I think the whole point of Bell v. Wolfish was a pretrial detainee, a quay pretrial detainee can't be subjected to extreme mistreatment unless there is a very good reason for doing it. But, okay, I hear your – I mean, again, the fact that it is – Here they are making a choice. They're saying, in my view, outrageously mistakenly, that this man is someone who needs this treatment for the security of the prison. And, you know, one might question whether what I think is outrageously mistaken even counts, because they're the experts and we're supposed to defer to them. But even if I think it's so outrageous that it overcomes my deference, don't I have to also be able to say they were on clear notice somewhere for them to be held liable in damages? They were on clear notice that they shouldn't do this. Yes, but there are two parts to that. First, there are – there's plenty of cases – or plenty – there's a number of cases cited in my brief, but Benjamin v. Frazier, for instance, Iqbal v. Hastie, for instance, the Osgood case, for instance, the Friedland case, for instance, all of those cases are similar. Now, the most compelling one, frankly, I think, is the Benjamin v. Frazier case, where they're in bed of consent decree and they say that you can't have the kind of physical restraints that they're imposing on this guy. Now, look, I don't think it takes much of a stretch to say, if you're saying that a guy who's in punitive segregation is entitled to good time and a guy who's in administrative segregation is not, demonstrate how the state – demonstrate how the refusal of good time for a guy who's a pretrial detainee helps the security of the institution. They can't. Demonstrate how – Or the alternative, how it's not punitive. Fair enough, which I think is two sides of the same coin. Exactly. But – and demonstrate how the male restriction has anything to do with it, especially when you're a pretrial detainee and you're trying to prepare your defense. How do you do that? You can't. And they weren't able to do it on the stand. The judge saw right through it. Second half of the problem that we have here is the state never claimed that the reason that they did this was for institutional security. Their basis, and it's in all their briefs up until now, is to maintain the integrity of the AS program over and over and over again. That's why we did it. And that was a judicial admission. Should they close their eyes to what they viewed was a past attempt to create a mass disturbance? Well, as a preliminary thing, no. That said, that wasn't what was considered. There wasn't that kind of individualized attention given to him in his hearing. Now, that said, I think that I would submit that they still have to find the kinds of things that Judge Lentz was talking about, where he has escape problems, he has gang problems, he was in the Latin Kings, whatever it is. There has to be more than he had this one circumstance a year and a half ago. And now, look, had he come back as a convicted prisoner, I don't think he gets a vote. I think at that point they can put him in sight unseen or whatever. Here it is. You're in. You're going back in. We'll figure it out later. Does the record say what he was charged with that led to this detention? And does the record show what he was in prison for at the time of this alleged incident? Both drug offenses. Okay. So there's no – as far – is there any evidence of any violence in his history? Not that I'm aware of. Not any kind of Latin King type violence. No, nothing like that, no. And I don't mean to misspeak, but I think all of his offenses are drug offenses. And it was in the record at some point. I'm sorry, Your Honor. My time has expired. We would respectfully submit that the opinion and the decision of the district court should be sustained. I just want to go back to a second – to phases two and three. What is the evidence that the isolation phases two and three was so excessive as to be punitive? Well, speaking certainly to phase two, phase two is functionally the same as phase one. He's incarcerated in a cell 23 hours a day, able to recreate only under limited circumstances. The functional difference is that instead of being in solitary confinement like phase one, you're confined with another individual. The other incidents – Also, isn't there counseling during this period? There is some, but not like in phase three. In phase three, there's substantially more. There's some initial type counseling, but that doesn't change the other aspects of it, which is the denial of good time credit, the denial of the ability to shower without clothes on, the ability to retain mail, all the things that were deemed important by the court and punitive by the district court. In fact, the district court found intent because, as counsel suggested in his argument, he said that the only thing the district court did was compare punitive versus administrative. That's not what the court did. The court did effectively three things. There was the comparison between the AS program and the punitive program. There was a comparison between the conditions of confinement and the code of penal discipline, those things that the Department of Corrections deemed punitive, the things that they used to punish people. And all three, by the way, in AS1, AS2, and AS3, all three of those phases, you're deprived of all of those sanctions in the code of penal discipline are imposed on you. And number three, the court looked at those things which are deemed privileges that every prisoner is entitled to. And so how many of those were the folks in AS1, AS2, and AS3, which one of those privileges did they get? And the answer is none. So they didn't get the comments there. They didn't get the religious service. They didn't get the ability for contact visits. They didn't get the ability to talk on the phone without particularized showings as to who you were talking to. All of these things. The court went down the line, and first the court looked at privileges. None. Then they looked at the code of penal discipline. All. Then they looked at a comparison between administrative segregation and punitive segregation, and administrative segregation is worse. The program that the DOC says is punitive segregation. This is the harshest thing we can do to you, punitive segregation. We're going to put you in the box. Use the street term. Administrative segregation is worse. It's not a short duration like punitive is. It's indefinite as long as they feel like it. In punitive, the one where they're really punishing you, you don't have to shower in your clothes, but you do in administrative segregation. In punitive, you get good time. In administrative segregation, you don't. All of those things. So administrative segregation is worse than punitive segregation. How can that be? And that's what the court did. So in answer to your question, if you compare 1, 2, and 3, and you apply the three standards that the court did, the privileges, none in 1, 2, and 3. The code of penal discipline, all in 1, 2, and 3. And then the comparison between AS and punitive, there's some differences. It gets slightly better in 3, slightly better in 2, because you're not in solitary. That's the fundamental difference between 1 and 2. Let me just also ask you for a moment about the procedural aspects here. So there's the requirement of written notice, adequate time to prepare a witness, a written statement of the reasons for the actions taken, and a limited ability to present witnesses and evidence under the Benjamin v. Fraser case. Why isn't that satisfied here? Two parts. Did they give them a written notice? Yes. But the written notice says, we're putting you in because you were in the AS program, which is not a valid reason. And 2, the court said that they made no particularized adjudication. And, in fact, the district court called the hearing spurious and a sham. So, you know, I don't know how he could have had a full-scale trial, kind of jury the whole nine yards, but if it was deemed a sham because what they were talking about and considering was not the appropriate things they should be considering. All they told him was you're in because you were in before. Yes, ma'am. So, I mean, I don't know if this matters really, but conceptually it sounds to me like the real issue here is substantive due process. There's not a problem that he didn't get the kind of hearing that if they were considering the right things would have been an adequate hearing. Correct. It's just that as a substantive matter there was an inadequate basis for doing this to him. Well, I think that the court, the district court says something similar to that, but what the court essentially said, and I'll defer to the judge, but what he had said is that what they're considering, the things that they're considering and the lack of particularized constitutes a procedural deficiency. We might be talking about two sides of the same coin, and I'll defer to the court. And just out of curiosity, were you counsel below or were you appointed just here? I was the trial counsel, yes. The trial counsel too. Yes, sir. Thank you very much. Thank you. You've asked for one minute. Just to address a few of the points. There was a particularized finding here that Mr. Alla was a risk to safety. It was based on everything he had done before, what he had done within one year of this very return to, and all the evidence was absolutely this is what we considered, this is what we were looking at. Secondly, the mention of good time, earning good time credit. There was no evidence that Mr. Alla was even entitled to good time in the first instance. The restrictive nature, and in fact in reality he was not. Good time didn't even apply to him at that point in time. So there's no evidence that good time even applied here. So that is a complete red herring in this case. With regard, and I never answered Judge Poole, your question about the mail. The evidence at trial from Captain Cahill, Captain Cahill said we had an administrative directive that said there can only be five pieces. What he said was, but in practice, with the AS program, that's not how we did it at Northern. So Mr. Alla wasn't subjected to that. He didn't testify that his mail was limited in that event, and that- It wasn't enforced. It was the rule, but it wasn't enforced. That's not how we did that. So when he was asked what's the reason for that rule, he said I don't know because I don't do that. That's not what Mr. Alla was subjected to. So these general conditions of AS confinement had been upheld by numerous courts before. There was a specialized finding, and again, there is no case law that would put these individual defendants on notice that considering his prior institutional history as here, considering in accordance with policy, the fact that he had not finished a, again, policy, a program that was designed, and the testimony was that the phase one program was designed to help an inmate do his time safely and for safety and security. So certainly the phasing program and that whole program is designed for safety and security. That was the clear testimony in this case. And again, I think if you strip away the decision, it seems to me as I read that, that what the court is saying is that you can't look at that. There's no finding because, and I think the court even says it, he had done nothing since his readmission to justify being placed in AS. And the defendants agreed at that point. He had not done anything in that brief period of time that he was back that justified readmission. What did justify readmission to AS was the fact that he was the ringleader in a very dangerous situation in a recent history and had not engaged in the program that's designed to help him do the time and help others do that. So again, I don't believe this establishes an intent to punish, that there was punishment here, or that the reaction was excessive to answer Judge Lynch's question. And even if it were, I think qualified immunity protects these individual defendants who as Judge Garfinkel himself acknowledged were doing their job. They may be mistaken, but they were doing their job. Just following orders. Just following orders. That's all they were doing, right? No, that's not, I don't think that's what he's saying. They were doing their job in a professional manner is what he said, but they were mistaken here. Thank you. Thank you both for your arguments. The court will reserve decision. I want to particularly thank you, Mr. Morgan. I would thank you anyway for an excellent presentation if you were just pro bono counsel here. But my experience is that we have more lawyers looking to argue pro bono appeals than we have cases to give them. My experience on the district court was it was not so easy to find people to take on the amount of labor that you took on in the district court. So it's very much appreciated that lawyers are making themselves available to do that. My pleasure. We thank you for your service. Appreciate it from the defense side as well. It makes the case go much smoother, frankly. Nice that you also got an award of fees. Well, let's hope it stands. So far. Thank you.